Good morning, Your Honor. May it please the Court, my name is Ana Lemar. I'm representing the petitioners, Gabriela Medina and Jesper Marin, in this case. Basically, Your Honor, the issue in this case relates to the finding of no past persecution or well found of future persecution. Both of those elements with regards to the past persecution comes in with the characterization that the immigration judge and the BIA, as a result of finding in those that a source of the threats that petitioners suffer from 2012 through August of 2014, basically are coming from unrelated sources. Unfulfilled threats, and that is their characterization. However, petitioners feel that actually the threats are coming from one source behind the different people or set of people that actually made the threats, and that would be the government. If you look into the factual issue, which is heavily what we have to see, is that one of the threats that they had in February of 2014, for instance, is coming up with the march where they participated. The threats came from two individuals in a coming in to break up the march with the government. They are identified by the two individuals. They're a threat with their lives by those two individuals, with the support, we can say, from the government. That would be a very specific threat that we have. As far as the three incidents that happened with the bakery store, the individuals that came to threaten, to demand the regulated goods, basically are coming also from the communal councils. Community councils are neighborhood groups that basically the government also have set up to engage in the communities and the business. Again, the threats are not just coming from either a criminal site, which is what the BIA is basically stating, or is coming from a non-related source. We go back again through who is behind the community councils, and that would be basically the government again. Petitioners also even ask for protection to the security guards there, and we have also that even the security guards decided to tell them that they could not provide any protection because it was the community council. It's that characterization of who the group who is threatening petitioners. We move towards the fact that the three incidents also have escalated. It's the same people threatening them, first requesting and demanding the regulated goods. Then there were two specific individuals that came and threatened, basically assaulted petitioner, requesting the goods. What is missing from the language in the immigration judge's decision is basically that they specifically told petitioner that they were coming to get the goods because they support the opposition. They oppose the system. That is missing, and that is from testimony that we find from petitioner. I understand from the decisions there is an issue about credibility which is not before this court, so we have to take testimony of petitioners and rely best to the petitioners. That is something that comes up that it's not just a criminal act. It's basically coming from the opposition that they had, and that is the request that they, the threats coming from. We also move into- I want to make sure I understand. What you think is missing from the IJ and BIA decisions is the fact that these threats came because of political activity rather than for purely criminal reasons. Yes, Your Honor. Is there anything else important that you think was omitted from the IJ and BIA decisions? Basically that, to my point, I think that is the main point. Let me ask you this related to that. With respect to the black truck incident, does the BIA decision discuss at all the shooting that was involved? I did not see it. Well, the BIA doesn't really discuss it. It just points out to the immigration judge's decision and the way the judge stated the facts. The judges also did not fully explain or fully state the facts in testimony that the petitioner gave. Basically, they just point out to the black truck, but they missed the point that the following morning, one of the neighbors actually told petitioners that they had seen the driver, that the driver was wearing a jacket with the acronyms, I believe it's . . . I'm going to point you to page three of the BIA. They have two paragraphs expressly. Not only do they refer back to the IJ, which has a very long discussion, but they have on page three about the black truck. They saw unfamiliar vehicles in the mother-in-law's house. They left the home. The black truck followed them. I'm reading from the BIA, honking its horn, flashing its light. They went into the garage. They heard from a neighbor the driver was from a state agency. That's just what you were talking about. You're saying that's missing. It's right here, saying they heard from a neighbor the driver was from a state agency, but the respondent did not submit a statement from the neighbor. Anyway, they went on and talked about . . . Although she asserts the incident with the black truck was perpetrated by members, the record has no statement from the neighbor who purported it was . . . Anyway, they have a full discussion. Yes, I stand corrected, Your Honor. Huh? Yes, I stand corrected, Your Honor. Yeah, right. So, I think it's fair to say they talk about the black truck and that . . . This is not only . . . If I may . . . Go ahead. It's not only the black truck, but the fact that who's the driver is. It's coming from a state agent. It's, again, if it is a state agent . . . The neighbor said in the testimony . . . Excuse me. Your client or somebody said that the neighbor said to the house they went to . . . So, she went to . . . drove in the garage of a friend. That friend says the next day that the neighbor says that the person driving the truck had on a uniform. Yes, Your Honor. Okay. That's correct. So . . . And the inference being that was then for somebody who worked for the state. Correct, Your Honor. And we go back to the same point that I was trying to make. It's basically the same issue with the several attacks. All of them are seemingly coming from the government or pro-government or people that are related to the government. And that's the reason why we petitioners think that these threats are not unrelated. You know, not only that, for past persecution, we also need to have them rise to the level of persecution as contemplated. And we do things that is not only verbal harassment that they suffer. We had, in those two occasions at the bakery, there were armed people that came to the . . . from the community council to request and demand and telling them that they're from the opposition. The black truck also, we do have in the facts that there were fires shot at them. So . . . What I found interesting about that, and I went back and read the testimony, your client says they were following and honking them. So she called a friend. They went into the garage. Your client's very specific. They went into the garage and she said she saw the black truck pass the garage and keep going. And then she heard shots later. So there's no saying the shots were at them. Now, maybe they were shooting in the air to scare your client. I think that could be an inference. But there's no evidence they were shooting at your client at any time. Is that correct? You can make that inference, Your Honor. I'm not making the inference. I'm asking you . . . She pulled into the garage and the . . . she saw the truck go by. She went into the garage. They closed the garage. She stayed there a while. And then they heard . . . I mean . . . Yes. They drove by and then later . . . I mean, I think it might be a short time later, very quickly, she heard shots. But it was after the truck had passed the back of the garage. She makes that clear. Yes, Your Honor. They heard shots. They thought that it was . . . The truck didn't come back to the garage or do anything to the house or anything? No, Your Honor. At night or the next morning or anything? No, Your Honor. Okay. I have a little confusion about that because I thought I saw in the record that Medina said that someone shot at them, quote, several times, unquote, while they were on the road. And that they heard more shots after they went into their friend's home. Did I . . . maybe I misunderstood that. No. From the record, my understanding is that they heard shots after they went into the garage. So just to be clear, there were . . . no one was shooting at them while they were on the road? No, Your Honor. Okay. Thank you. So going back to my point, if all those are coming from a common source, they're not unrelated. We know that the government is able to protect them. So the past persecution also rises to that level that we need. Even at the march, the individuals that approached them, they were together with the National Guard. That specific death threat that they received, supported seemingly by the government as well. So they do stand that if they come back to the country . . . I mean, there was past persecution, but even so, if they come back, they would be singled out again because of the political activities and because it's the government that is actually behind all the threats and all the future threats that will be. I yield my time, Your Honor, if you don't have any other questions. Thank you, Counsel. Thank you. Good morning, Your Honor. May it please the Court, Eric Anderson representing the Attorney General. Ms. Calabria-Medina had a full and fair opportunity to present her case to the immigration judge and board. They considered all the evidence she presented, and they reasonably concluded that she had not experienced past persecution or did not show that she had a well-founded fear of future persecution. The record does not compel the contrary finding. Can I ask you the same question I asked opposing counsel? About the shots? Yes. Is there any evidence in the record that she testified that she heard shots or that she was shot at while she was on the road? My recollection of the testimony matches my colleagues that it was only . . . it was like one or two shots after they pulled into the garage. I don't . . . I think while they were driving it was, you know, headlights flashing, maybe horn honking, that kind of harassment. I'll tell you why I'm asking you. Because we have a case from this circuit called Sanchez-Jimenez versus U.S. Attorney General where we have held that getting shot at in a moving car qualifies as extreme under any definition. And so, to me, you know, the facts here are really . . . I mean, the facts are always really important, but they're particularly important here. And if I am not understanding the record correctly, and it's quite possible that I just missed it and attributed it to being shot at on the road, but you're both telling me that they were not shot at on the road. Is that correct? That's right. And in Sanchez-Jimenez, not only were they shot at, but there were bullet marks in the vehicle. That was the evidence, combined with other evidence of a kidnapping. That's true, except that here, the BIA assumed that she was credible. So, if she had testified that they were shot at on the road, we would have to take that as the facts. Wouldn't you agree? To the extent her testimony indicated her basis for knowing where they were shooting, potentially, but I don't . . . And the BIA has decided to accept that as credible. What basis would we have . . . She heard shot, Your Honor. I'm sorry, Your Honor. Okay, but the hypothetical is, she said they were shot at as they were riding in the truck. Under those circumstances, where the BIA is deemed her credible, we would have to accept that, right? Yes, Your Honor. Okay, but that's not a problem here for you, because according to both you and opposing counsel, she did not say anything like that, right? Yes, Your Honor. Okay, thank you. So, this court's cases that have found that unfulfilled death threats rose to the level of persecution usually involve circumstances like the death of a close associate, who was not only threatened but actually killed, or it involves situations where the threat was much more imminent or menacing, such as the bullet holes in your vehicle, or being kidnapped and said, we're going to kill you tomorrow, and then you escape, or if someone comes and holds a gun to your head and you think it's loaded and he pulls the trigger, it's not loaded, but it produces actual harm that is absent from the testimony that Ms. Calabria-Medina and her husband presented. I can go through them. In June 2010, the husband joined the political party. They described being harassed, heckled even by supporters of Chavez and then Maduro in the years after, whenever they were participating or handing out leaflets, clothing, flyers, engaged in voter get-out-the-vote campaigns, that sort of thing. There is December 2014, there is the one threat where one or two people on a motorcycle came up, addressed them by name, said, we're going to kill you, and then that's all we know about that incident. Let me ask you a question in response to counsel's identification of a problem. She says, as I understand it, the main thing omitted by the BIA and the IJ was that this targeting was a result of political activity. Do you disagree that that omission was an omission? No, Your Honor. The burden on Ms. Calabria-Medina was to show both past harm or a well-founded future harm and a nexus to what we can easily identify in this case as a political opinion kind of claim. The immigration judge rejected the past and future persecution and alternatively found that these harms were not on account of political opinion. My reading of the board's findings is that it did not adopt this alternative nexus finding, but the issue of connection to a political opinion is a separate reason that she would have to satisfy the fact finder before she would be eligible for asylum. Insofar as there is a potential claim that all of these incidents between 2010 and the 2014 departure were by some kind of powerful government official working through different operatives, that's just not in the record. There's no reason to doubt these were all pro-Chavez individuals, but there's no indication that there was someone pulling the strings. So then we've discussed the incidents while they were on campaigns. There's the incidents in the bakery, which involved two threats to close the bakery. What I just add about the bakery is that so far as the government was concerned, they were perfect candidates to receive these regulated goods. They got the bread, flour, butter, sugar, those kinds of things they needed in their business. It was just the neighborhood groups, the pro-Chavez neighborhood groups who wanted it, and when they weren't given it, they were subject to  When they did close the business, there were some telephonic threats from different people at different times, not connected in the evidence to one individual. And then there's obviously the riding away from the mother-in-law's house in August 2014, which we've discussed. I believe the difference there is that there's no evidence that the shots were fired at the truck. As you described, she pulled into the garage, and then she heard the shots as the truck went by. And finally, there's the issue of when the mother-in-law learned that they had sought asylum in the United States, she sent an email, again, not in person, threatening to turn them over, that this kind of threat does not itself rise to the level of persecution. And then if we turn to the issue of the burdens on Ms. Calabria Medina, does she have a well-founded fear of future? And the evidence is that as not a leader of a political party, not a main activist, indeed not even a member of a political party, the State Department's evidence of conditions in Venezuela fails to show that she has even a reasonable possibility of future persecution. And so unless there are any questions, we would ask that the petition for review should be denied, because a reasonable fact-finder could make the findings in the record. Thank you. Thank you, counsel. Hi, Mayor. Just going back to the point that Sponda's counsel points us to the well-founded fear of persecution and the email threat they received by the mother-in-law. And basically, that email told them that they were going to be turned into a group that was going to be taking care of the opposition. So we go back to the same thing, that it's government groups that we can infer that is going to be taking care of the opposition. As far as to the well-founded fear of persecution regarding a pattern of persecution, we find that even though petitioner herself was not a member, her work, her political work was really entwined with her husband's work, who was a parochial leader. The parochial leader, yes, we grant that it was not a leader national or maybe statewide, but still a community leader within their own community. They basically were everywhere during voting polls, helping with the transportation. So we do know that by just being with the husband and working with the husband very closely, and being that he is a parochial leader, there should be also an infer of imputed political opinion that she has due to her husband's work. Thank you. Thank you, counsel. We'll be in recess.